## Case No. 2,408.

### CARLETON v. DAVIS.

[2 Ware (Dav. 221) 225; [1] 3 N. Y. Leg. Obs. 86.]

District Court, D. Maine. April 4, 1844.

PUNISHMENT OF SEAMAN—ACTION BY, FOR ASSAULT—NECESSARY PROOF.

1. The master of a vessel has a right, in cases of necessity, to correct a negligent, disobedient, or mutinous seaman, by corporal punishment. But the punishment must be reasonable, and not inflicted with unlawful instruments.

[Cited in U. S. v. Harriman, Case No. 15,311.]

2. When a seaman prosecutes the master for an assault, and it is proved that he has been guilty of a fault which would justify some punishment, to entitle himself to damages he must show that the punishment was excessive in degree, or unlawful in its kind.

In admiralty. This was a libel for what is technically called, in the admiralty, a cause of damage. The libellant [Thomas Carleton] alleged that he shipped on board the brig Androscoggin, at Baltimore, as cook and steward, in March last, for a voyage to Portland, and that during the whole voyage he faithfully performed his duty; and that on the 17th of March, between the hours of ten and eleven o'clock at night, all hands being called on deck, as soon as he heard the call he dressed himself and went up; that when he went on deck he was seized by the captain [William V. Davis], who struck him over the head with a large piece of wood, called a belaying pin, severely wounding him and causing the blood to flow profusely from the wounds; that after striking him about a dozen blows, he called the mate and told him to kill him, the libellant, and throw him overboard; that he then again assaulted the libellant with a rope, giving him, over the head and face, a large number of blows, severely injuring him, and he prays the court to pronounce for the damages he had sustained. The answer denies that the libellant did his duty as a faithful seaman, but avers, on the contrary, that he was negligent, disobedient, and insolent; it denies that the master struck him with a piece of wood, but admits that he did strike him several times with a small rope, and pleads a justification that the libellant refused to do

[1] [Reported by Edward H. Daveis, Esq.]

his duty and made the first assault on the master.

Mr. Fox, for libellant.
Mr. Howard, for the master.

WARE, District Judge. The libel, in this case, states a grave and serious injury, and from the marks still remaining on the person of the libellant, it is evident that he actually received in the meleé, one or more pretty severe wounds. If they were inflicted in the manner stated in the libel, and with the instrument that has been produced and exhibited in court, it is a case undoubtedly that not only calls for damages, but for exemplary damages. For the instrument is one that, in the hands of a vigorous man, with the exertion of even less than his whole strength, might well effect not only a severe but a fatal injury. Now, admitting the doctrine of the law, as claimed by the counsel for the respondent, that the master has the legal authority to correct and chastise a refractory, disobedient, and mutinous seaman, it is to be recollected that the law has imposed two important restrictions on this right; first: that it must be reasonable and moderate in degree, and secondly, that the punishment shall not be administered with unlawful instruments. Now, it will readily be admitted that a billet of wood eighteen inches long, and nearly as large as a man's arm, is not a proper instrument to be used in punishing a seaman. Nothing short of some personal danger to himself, from the violence of a man, could justify the mastei in assaulting a seaman with a deadly instrument, and such this undoubtedly would be in the hands of a man of ordinary strength. If, therefore, I was satisfied by the testimony, that the master actually assaulted the libellant with this belaying-pin, which has been brought into court, I should feel no hesitation in giving damages on this ground alone, although the same evidence might show that the seaman was in fault and deserved some correction. For I hold it a wholesome rule to be insisted upon and to be firmly upheld, that the master shall not, in punishing his men, though they may be in fault, use instruments of correction which endanger life or limb, and may produce fatal effects.

The difficulty, in this case, is in ascertaining from the evidence whether this billet of wood was used or not. It is charged by the libel, and denied by the answer. But, as no person was in sight when the affray took place, the case is left, on the conflicting allegations of the parties, each probably, as is usual in such cases, a quick witness in his own favor, very much to the conjecture of the court. Only two witnesses have been examined who could give any account of the affair, one called by the libellant and one by the respondent, and the night being very dark, neither of them was in a position to

see what took place, and from the loud whistling of the wind through the rigging, neither of them near enough to hear but very imperfectly what was said. Antonio Cook, one of the hands, was at the mainmast head, nearly over the spot where the affair took place. He says that the first he heard was the master asking Dunning, the mate, whether the cook had got on deck, and then he sung out for some one to take the helm. The next thing he heard was a number of blows, as of some one striking a man with a piece of iron or stick of wood, and he heard the captain say, 'Take that and go forward.' He heard a number of blows, and the words, 'Go forward to your duty,' several times repeated. He soon after heard Dunning sing out, 'Let go,' and immediately after heard the captain say, 'Kill him and throw him overboard.' The master, he says, spoke very loud, but he did not hear the cook's voice. Dunning, the mate, who was called by the master, says that when all hands were called, he came up and went forward to take in the sails, and that about twenty minutes or half an hour after, the captain. called to him and asked whether the cook was on deck, and he answered that he was not. He then called him and again went forward to complete the taking in of the sails. About fifteen minutes after, he heard a scuffle in the after part of the ship, and heard the captain say, 'Go forward to your duty.' He then went aft and found the cook holding the captain pushed backward over a spar by the companion-way. The master called out to him to take him off. He then spoke to the cook and told him to let the captain go, and he not minding, he took hold of him, and, after pulling him three or four times, succeeded in breaking his hold. After he had taken him off, and turned to go forward again to duty, the cook went at the captain a second time, saying, 'Put it on, I want you to flog me,' and seized the master again. The mate again returned and pulled the cook off and threw him down over some hewed timber. The cook then went forward to his duty. and continued to do duty for the remainder of the voyage. This is the material part of the testimony, for though one more witness was examined, he added nothing that materially varied the case. The mate did not observe at the time that the libellant had received any material injury, and he heard no complaint from him. The testimony of Cook, connected with the fact that a severe injury was certainly inflicted on the libellant, if it stood alone and unaffected by any other evidence in the case, would certainly go far to convince one that a rude and violent attack was made upon the libellant by the master. He was not, it is true, in a situation to see the parties, or to hear but imperfectly what was said. But he heard the scuffle and blows given, and heard the captain's voice loud above the wind, telling him to take that and go forward; and the libellant came out

of the scuffle a wounded man. But then it is clear that the witness did not hear the whole. He heard nothing until the quarrel became loud and violent, and the beginning of it escaped him. Although, on the whole, the court might be inclined to believe on this evidence alone, that an unjustifiable assault was made by the master, yet it would be a conclusion to which one would come from an imperfect account of the whole affair, and, of course, a conclusion upon which the mind could not rest with entire satisfaction. But then we have the testimony of Dunning, the mate, also, to a part of the affair, which, although not necessarily in contradiction to that of Cook, gives to the case, on the whole, quite a different aspect. Dunning came to the parties while they were engaged in the scuffle, and the libellant then had the master down, and it was with considerable difficulty he succeeded in pulling him off. But it does not necessarily follow that the one who has the better of a fight at the close, is the one who provoked and began it; nor is it to be easily believed that a seaman, without some strong exciting cause, would commence an assault on the master. I do not recollect a single instance, among all the assaults and batteries that have come before me, and they have been pretty numerous, where a seaman gave the master the first blow; nor do I now remember a case where he returned the blow. Indeed, it must be a very peculiar case in which a seaman could be justified in returning a blow. The marine law is very strict on this subject. 'The mariner,' says the Consulate of the Sea, 'is bound to bear with the master if he reproves him in injurious language, and if he makes an assault upon him, he ought to fly to the prow and put himself on the side of the chains, if the master passes them he ought to fly to the other side, and if the master pursues him there, he may call witnesses and stand upon his defense.' Chapter 165. Waiving the minute and studiously exact directions contained in this article of the Consulate, in its general spirit and object it constitutes the maritime law of the present day, and is confirmed by all the most authoritative expositions of the law. Jugemens d'Oleron, art. 12; Cleirac, p. 48; Laws of Wisbuy, art. 26; Ord. de la Marine, liv. 2, tit. 7; Valin, Comm. p. 553; Emerigon, Traité des Assurances, c. 12, § 6.

It is only in very extreme cases that a seaman can be justified in turning upon the master and resisting him with force, and when he can protect himself from a dangerous assault in no other way. Nothing could be more pernicious to the police of the sea, than to admit that a seaman might, as a general rule, resist the master by force, even when inflicting undeserved punishment. It would be sure to lead to numerous scenes of violence and insubordination, and endanger all authority. The duty of a seaman, in such case, is to submit to wrong. The nature of the master's authority, which is of a quasi parental character, and the necessities of the service imperiously require it. On his return to port, he may appeal to the law for redress, and the master will be held to strict responsibility for any abuse of his authority. If he does not do this, but takes jurisdiction of his own wrongs, and seeks redress from his own hands, the courts will be slow in entertaining his complaint, and taking jurisdiction of an appeal from a wager of battle, even if originally he had just grounds of complaint. He may be in danger of impairing a good cause of action by matter ex post facto. Unfortunately, in this case, we get from the testimony but a mutilated account of detached parts of the affair, and have no account of the circumstances with which it commenced. In the absence of proof, the court cannot let itself loose into speculations on probabilities. And the complainant who asks for the interposition of the court, must make out his case. However well founded the cause of the complaint may be, if it cannot be proved, he can have no decree in his favor, for the decree must follow the allegations and the proofs. This is an infirmity that belongs to all the administration of human justice. In jurisprudence, a fact that cannot be proved is the same as a fact that does not exist. Mere probability, founded on general presumptions, however they may incline the private judgment of the man, cannot amount to that judicial proof that is required to satisfy the magistrate. It is a remark of the most profound of all the commentators of the Roman law: Quae non est plena veritas est plena falsitas, non semi-veritas. Sic quae non est plena probatio plane nulla probatio est. Cujas,—cited Toull. Droit Civil, vol. 8, No. 8. And this rule, when applied to the whole merits, is certainly sound, however questionable it may be in its application to the doctrine of semi-proofs, admitted in the jurisprudence of some of the continental nations of Europe. Now, though it is sufficiently apparent that the libellant received a pretty severe wound in the scuffle, it does not appear how the wound was made. It might have been by a blow of the captain with a billet of wood, or it might have been received in the fall, when he was thrown down by the mate. But then whatever punishment may have been inflicted by the master, it was preceded by a gross fault on the part of the libellant. When called to duty, in a time of great peril, he had not answered the call, and when called a second time he came tardily. In such a case, some haste and impatience on the part of the master might well be pardoned; and if, in reproving a tardy and unwilling man, there was something of an overcharged manner, and even if the reproof was accompanied with moderate personal chastisement to hasten the movement of a loiterer, a maritime court would certainly feel inclined to look upon it with indulgence. Such is not the time,

as has been well observed, when we are to look for gentleness of manner and a measured caution in the appliances resorted to for the purpose of enforcing quick obedience. The necessities of the service demand the greatest promptitude, and the punishment of the moment may be indispensable to hasten a dilatory and unwilling seaman. 1 Boulay Paty, Droit Maritime, tit. 4, "Prolegomenes," p. 374.

Where a seaman complains against the master for an assault, and it is proved that he has been guilty of misconduct which would justify some punishment, he cannot entitle himself to a decree but by showing that the punishment was excessive in degree, or unjustifiable in kind. The master has a right to correct the disobedience of a seaman by corporal punishment, in cases where the necessities of the service call for it, and, though it should be sparingly resorted to, a court will not hold the master amenable, if he does not pass the limit of a reasonable and moderate discretion. However the truth of the fact may have been, the libellant has failed to prove that this limit has been passed.

But there is another fact proved that places the libellant in a very unfavorable light, and that is the insolent and mutinous manner in which he turned upon the master after he was first torn from him by the mate. It is in proof, that the master was at the time in a feeble condition from ill health, and the libellant had already ascertained by trial his own superiority of strength. Now this violent and criminal attack would go far, in the judgment of a maritime court, which is always disposed to uphold the just authority of the master with a steady hand, to impair a good cause of complaint. It exhibits him in the light of a man of unchastened and ungovernable passion. It also throws back some light on the obscurity of the preceding part of the affair, and justifies a suspicion at least, that he was not backward to engage in the fight in the first instance.

I pass over without remark the supposed acknowledgments of the libellant, after his arrival in this port, of the general good treatment he had experienced from the master. Seamen are often artfully surprised into such acknowledgments by the friends of the master, when it is apprehended that some controversy may arise, for the express purpose of using them in evidence. They are always a suspected kind of evidence, and are usually entitled to very little consideration. Libel dismissed.

[NOTE. Flogging on board vessels of commerce was abolished by Act Sept. 28, 1850 (9 Stat. 515; Rev. St. § 4611).]